[Cite as *Quehl v. Roberts*, 2025-Ohio-4742.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

DANIEL J. QUEHL,                    :          APPEAL NO.    C-250031
                                              TRIAL NO.     DR-2301002
    Plaintiff-Appellee,        :

  vs.                              :
                                                   *JUDGMENT ENTRY*
BONNIE M. ROBERTS,                 :

    Defendant-Appellant.       :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/15/2025 per order of the court.**


**By:**_____
      **Administrative Judge**

[Cite as *Quehl v. Roberts*, 2025-Ohio-4742.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

DANIEL J. QUEHL,                    :          APPEAL NO.    C-250031
                                               TRIAL NO.     DR-2301002
    Plaintiff-Appellee,        :

  vs.                              :
                                                      *O P I N I O N*
BONNIE M. ROBERTS,                 :

    Defendant-Appellant.       :


Civil Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 15, 2025


*Law Offices of Nicholas A. Kulik, LLC*, and *Nicholas A. Kulik,* for Plaintiff-Appellee,

*Durst Kerridge LLC, Paul R. Kerridge, Alexander J. Durst* and *Maddie J. Wilhoite,* for Defendant-Appellant.

**Bock, Judge.**

{¶1} Defendant-appellant Bonnie M. Roberts ("Mother") appeals the trial court's decision sustaining Daniel J. Quehl's ("Father") objections to the magistrate's decision and denying her motion to modify her and Father's existing custody order.

{¶2} In a single assignment of error, Mother argues that the trial court should have deferred to the magistrate's findings and abused its discretion when it found that the evidence failed to demonstrate a change in circumstances, that modification is necessary to serve the children's best interest, and that the benefits of a change of environment outweighed any harm to the children.

{¶3} But insisting upon deference to a magistrate's decision runs contrary to the trial court's duty to conduct an independent review of the facts and law under Civ.R. 53(D)(4). Plus, there is competent and credible evidence that Father grew as a parent and became more responsive to his children's mental-health and behavioral needs. That evidence supports the trial court's best-interest findings and conclusion that modification is not necessary to serve the children's best interests. We overrule the assignment of error and affirm the trial court's judgment.

## *I. Factual and Procedural History*

{¶4} During their marriage, Mother and Father welcomed two daughters, C.Q. in 2011 and M.Q. in 2013. In 2017, Mother and Father divorced in Washington. The parenting plan incorporated into the Washington court's order named Father as children's custodian and residential parent. Mother had parenting time each week on Thursday night and every other weekend from Thursday morning until Monday night.

{¶5} In 2017, Mother moved to Ohio with her current husband. Within months, Father moved C.Q. and M.Q. to Cincinnati to live closer to Mother. In 2018, the parties registered the parenting order with the Franklin County Juvenile Court.

Later that year, Mother relocated to North Carolina with her husband, who moved to live closer to his children. Two years later, Mother and Father agreed to modify Mother's parenting time. Mother had the children during spring break, part of winter break, and in summer in alternating years.

{¶6} At the time of trial, Father, C.Q., and M.Q. lived in Cincinnati with Father's parents ("Grandparents") in their four-bedroom house. Mother lived in North Carolina with her husband and one of his children, a teenage son.

{¶7} In June 2023, Father petitioned the Hamilton County Domestic Relations Court to accept jurisdiction over the case. The trial court accepted jurisdiction. In September 2023, Mother moved to modify custody of the children, citing C.Q.'s mental-health issues and Father's insufficient response to those issues.

## A. Emergency-custody hearing

{¶8} At a November 2023 emergency-custody hearing, Mother's evidence focused on Father's parental capacity to support C.Q.'s mental-health needs, protect his children from dangers associated with social media, and ensure his children's academic success.

### 1. *The children's mental-health needs*

{¶9} In March 2023, C.Q. used a school computer to search for information on suicide. C.Q. explained to her school counselor and principal that she had contemplated suicide because of "family problems." A Cincinnati Children's Hospital ("Hospital") employee conducted a suicide assessment of C.Q. over the phone using the Columbia Suicide Severity Rating Scale[1] ("C-SSRS"). C.Q. revealed that she had cut

---

[1] The C-SSRS consists of "a series of plain-language questions that can be used to help identify whether someone is at risk for suicide, to assess the severity and immediacy of that risk, and to gauge the level of support the person needs." *Jappen v. United States*, 771 F.Supp.3d 123, 130 (N.D.N.Y. 2025), citing Columbia University Department of Psychiatry, *Columbia-Suicide Severity*

herself the day before, struggled with body dissatisfaction, experienced auditory hallucinations, and planned and intended to attempt suicide. Based on her C-SSRS responses, C.Q. was at "high" risk for suicide. As instructed by the school, Father took C.Q. to the Hospital that day.

{¶10} At the Hospital, C.Q. reported auditory and visual hallucinations, and feeling "that she was possessed." During a safety assessment that included a second C-SSRS, C.Q. denied any suicide ideation, explained that she wanted attention, she resorted to cutting for "stress relief," and identified "living with family" as a reason for living. Based on those responses, Hospital staff considered C.Q. "not at imminent risk to harm self." Her physician concluded that C.Q. was medically "stable" and "safe for discharge," and instructed C.Q. to start psychiatric treatment.

{¶11} At the hearing, Father testified that he "look[ed] in to" finding a counselor for C.Q., but she "refused." At home, Father removed all potentially harmful objects from C.Q.'s room and, along with Grandparents, closely watched C.Q.

{¶12} In the three months before the emergency-custody hearing, C.Q. had not mentioned or attempted suicide. Father acknowledged telling C.Q. that her self-harm was the result of demonic possession. Father was aware of bullying issues that C.Q. had experienced at school and denied telling C.Q. to pray to God to resolve the issue. Rather, he was in "constant contact with the school," contacted the parents of C.Q.'s bully to resolve the issue, and had the school separate C.Q. from her bully after the bully's parent refused to act.

{¶13} At the emergency hearing, Father agreed that both C.Q. and M.Q. were "in need of therapy and counseling." In a May 2023 agreed entry, Mother and Father

---

*Rating Scale*, https://www.columbiapsychiatry.org/research-labs/columbia-suicide-severity-rating-scale-c-ssrs (accessed Sept. 30, 2025) [https://perma.cc/Y27N-FL6R].

agreed to find a counselor for C.Q. and required both parties to assent to the counselor. Father testified that he proposed Positive Leaps, a counseling center near his family's residence. According to Father, Positive Leaps could accommodate the parenting schedule and provide remote counseling to C.Q. when she was in North Carolina. But according to Father, Mother was "very difficult on agreeing on anything."

{¶14} Mother testified that Father told Mother that C.Q. needed to live with Mother in North Carolina because of her suicide attempt. She also explained that she rejected Positive Leaps because it was not "a good fit" and merely offered "generic counseling services." According to Mother, C.Q. and M.Q. needed counseling specializing in "sexual behaviors," and Mother found a counselor "30 or 45 minutes" from the family's residence that offered investigatory services, support groups, and inpatient rehabilitation.

{¶15} Father's mother ("Grandmother") testified that, around the time that C.Q. was "out of control" and went to the Hospital, she had threatened to evict C.Q., Father, and M.Q. because C.Q. was behaving "like she was possessed." Grandmother attributed C.Q.'s behavior to the influence of a "girl at school" who told C.Q. "to do things . . . for attention." Grandmother clarified that she did not "mean it" and was upset with C.Q.'s behavior. Since that episode, her relationship with C.Q. had improved and Grandmother described the children as "really good."

2. *The children's social-media use*

{¶16} In the summer of 2023, C.Q. and M.Q. had Snapchat and TikTok accounts that they accessed through their phones, Father's laptop, iPads bought by Father, and iPads bought by Mother. Father testified that he occasionally monitored their phones and had logged into their accounts on Snapchat, but not on TikTok.

{¶17} Mother recalled that C.Q. and M.Q. were at her home that summer when Mother found "concerning" material on their devices, such as sexually-explicit conversations on Snapchat where the girls lied about their ages and sexual photographs and videos of C.Q. and M.Q. At the time, C.Q. was 11 or 12 years old and M.Q. was nine or ten years old.[2] Mother immediately confiscated both sets of iPads and installed a parental-control application on their phones with "strict parental controls to where they only are limited . . . to five minutes on Snapchat." Mother deleted TikTok videos from C.Q.'s account depicting "sexual dancing," and videos from M.Q.'s account of her lip-syncing curse words. Later that summer, Mother was concerned with one of C.Q.'s TikTok posts that read, "If I died tonight would you miss me?" Father spoke with C.Q. and M.Q., who explained that those posts are just "something they do on TikTok."

{¶18} Mother testified that Father had not adequately addressed C.Q.'s and M.Q.'s inappropriate social-media activity. Father testified that the children cannot access Snapchat because Mother had removed that app, he lacks access to the parental controls to limit TikTok, and the children are not allowed to use his devices. Mother recalled that while on a video call with C.Q. before the emergency hearing, she saw M.Q. in the background "on her phone doing a TikTok," and hearing Father remark "Oh, yes, your mom . . . doesn't want you on social media." Mother had seen C.Q. and M.Q. active on social media after that. Father testified that he was open to working with Mother to terminate the children's social-media accounts.

---

[2] Both M.Q. and C.Q. have summer birthdays and Mother did not specify when, in the summer of 2023, she discovered the material on their devices.

### 3. *The children's academic needs*

{¶19} C.Q. and M.Q. attended school in a Cincinnati suburb and participated in ballet, cheerleading, soccer, gymnastics, and other activities. When C.Q. was in fifth grade, the school guidance counselor ("Guidance Counselor") noticed an increase in behavioral referrals for C.Q. related to attention-seeking behavior. She recalled that C.Q. was having conflicts with a friend that year. But Guidance Counselor was not aware of any issues involving C.Q. in the first half of the sixth grade.

{¶20} Father testified that C.Q.'s teacher informed him at a recent parent-teacher conference that C.Q. was "doing good," although there is "room for improvement." M.Q. had no issues in school. Mother testified that she was unaware of her children's academic progress in school because Father prevented her from accessing her children's school records. Yet, the original custody order gave Mother and Father joint decision-making power over the girls' education.

## B. **Magistrate's interim order**

{¶21} In late November 2023, the magistrate issued an interim order directing Mother and Father to "ensure the enrollment of the children into therapy" and, if the two disagreed, Mother "may select the therapy provider(s)." It instructed Mother and Father to communicate through a coparenting application. Moreover, the order directed Mother and Father to "close all existing social media accounts of the children." Plus, the children's devices "shall include a parental control monitoring programs/app that can monitor the children's accounts and alert the parties to any inappropriate sexual content or transmissions."

## C. **Custody-modification hearings**

**{¶22}** The magistrate held hearings on Mother's motion to modify the custody order in April and May 2024. Before the hearing, Mother deposed Father and the deposition transcript is in the record.

### 1. *The children's use of technology and social media*

**{¶23}** Father explained at his deposition that, consistent with the magistrate's order, "Qustodio" was installed on C.Q.'s and M.Q.'s phones. As a result, C.Q. and M.Q. could simply text, FaceTime, make calls, and play games on their phones. At one point, M.Q. removed Qustodio from her phone while at a friend's house. In response, Father punished M.Q. and reinstalled Qustodio. He also recalled that M.Q. sent TikTok usernames to a friend in a text message in March 2024. He spoke with M.Q. and believed, at the deposition, that those usernames belonged to her friend. He reiterated to the children that they cannot maintain social-media accounts.

**{¶24}** In his deposition, Father discussed sexually-suggestive text messages that C.Q. had received from a friend after the emergency-custody hearing. In another message, C.Q. mentioned having a "vape." In response, Father spoke with C.Q. about the sexually-suggestive messages and vape. C.Q. denied owning a vape and Father did not find one despite having searched "[e]verywhere in her room."

**{¶25}** At the custody hearings, Father testified that he started taking the children's behavioral issues more seriously after the deposition and was closely "monitor[ing] their texts" by reading their messages at the end of the day. He recalled catching C.Q. and M.Q. sending sexually-explicit messages, confiscating their phones, and disciplining them. But that confiscation was temporary because Mother prevented Father from taking his children's phones away permanently. And he cannot "block"

them from sending sexually-explicit messages on their phones. Rather, Mother "has the phones" on "her account" and "can block people on her end."

**{¶26}** Mother had concerns about Father's supervision of the children's use of social media. She spent "hours and hours" teaching Father how to permanently delete their social-media accounts. Mother had investigated smart watches with limited capabilities to replace C.Q.'s and M.Q.'s phones. Father's attorney stipulated that he agreed to replace the children's phones with the watches.

**{¶27}** Mother testified that C.Q. and M.Q. spent spring break in 2024 at her house. During that week, she "intercepted a group chat" discussing websites "where you can video chat anybody, any strangers." Mother explained that the group chat had sexually-explicit pictures of a grown man. She also saw evidence that C.Q. and M.Q. had tried to sell explicit pictures to adults on that website. Mother blocked and deleted that group message from their phones and contacted the children's therapist, school counselor, and Father.

**{¶28}** Mother's friend from North Carolina testified that the children are normally "on the phone" when she visits Mother's house, but Mother has them "get off" their phones. Mother's friend had never seen any inappropriate behavior.

2. *The children's mental health & supervision*

**{¶29}** Both C.Q. and M.Q. see a therapist once a week. Father testified that C.Q. "really enjoys going, talking to the therapist, and she seems happier." Occasionally, Father joins the therapy sessions. M.Q. is also "doing well" in therapy.

3. *The children's relationships*

**{¶30}** Father recalled that C.Q. had a sleepover at a friend's ("J.") house and came home with "hickeys" on her neck. Father believed that C.Q. and J. were just friends and were not dating because the two did not "go out actually on a date." One

10