[Cite as *Quehl v. Roberts*, 2025-Ohio-4742.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


DANIEL J. QUEHL,                    :        APPEAL NO.    C-250031
                                             TRIAL NO.     DR-2301002
     Plaintiff-Appellee,        :

  vs.                              :
                                             *JUDGMENT ENTRY*
BONNIE M. ROBERTS,                 :

     Defendant-Appellant.       :


This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/15/2025 per order of the court.**


**By:**_____
       **Administrative Judge**

[Cite as *Quehl v. Roberts*, 2025-Ohio-4742.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

DANIEL J. QUEHL,                    :          APPEAL NO.   C-250031
                                              TRIAL NO.    DR-2301002
    Plaintiff-Appellee,        :

  vs.                              :

                                              *O P I N I O N*

BONNIE M. ROBERTS,                 :

    Defendant-Appellant.       :


Civil Appeal From: Hamilton County Court of Common Pleas, Domestic Relations
                Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 15, 2025


*Law Offices of Nicholas A. Kulik, LLC*, and *Nicholas A. Kulik,* for Plaintiff-Appellee,

*Durst Kerridge LLC, Paul R. Kerridge, Alexander J. Durst* and *Maddie J. Wilhoite,*
for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** Defendant-appellant Bonnie M. Roberts ("Mother") appeals the trial court's decision sustaining Daniel J. Quehl's ("Father") objections to the magistrate's decision and denying her motion to modify her and Father's existing custody order.

**{¶2}** In a single assignment of error, Mother argues that the trial court should have deferred to the magistrate's findings and abused its discretion when it found that the evidence failed to demonstrate a change in circumstances, that modification is necessary to serve the children's best interest, and that the benefits of a change of environment outweighed any harm to the children.

**{¶3}** But insisting upon deference to a magistrate's decision runs contrary to the trial court's duty to conduct an independent review of the facts and law under Civ.R. 53(D)(4). Plus, there is competent and credible evidence that Father grew as a parent and became more responsive to his children's mental-health and behavioral needs. That evidence supports the trial court's best-interest findings and conclusion that modification is not necessary to serve the children's best interests. We overrule the assignment of error and affirm the trial court's judgment.

## I. Factual and Procedural History

**{¶4}** During their marriage, Mother and Father welcomed two daughters, C.Q. in 2011 and M.Q. in 2013. In 2017, Mother and Father divorced in Washington. The parenting plan incorporated into the Washington court's order named Father as children's custodian and residential parent. Mother had parenting time each week on Thursday night and every other weekend from Thursday morning until Monday night.

**{¶5}** In 2017, Mother moved to Ohio with her current husband. Within months, Father moved C.Q. and M.Q. to Cincinnati to live closer to Mother. In 2018, the parties registered the parenting order with the Franklin County Juvenile Court.

3

Later that year, Mother relocated to North Carolina with her husband, who moved to live closer to his children. Two years later, Mother and Father agreed to modify Mother's parenting time. Mother had the children during spring break, part of winter break, and in summer in alternating years.

{¶6} At the time of trial, Father, C.Q., and M.Q. lived in Cincinnati with Father's parents ("Grandparents") in their four-bedroom house. Mother lived in North Carolina with her husband and one of his children, a teenage son.

{¶7} In June 2023, Father petitioned the Hamilton County Domestic Relations Court to accept jurisdiction over the case. The trial court accepted jurisdiction. In September 2023, Mother moved to modify custody of the children, citing C.Q.'s mental-health issues and Father's insufficient response to those issues.

A. **Emergency-custody hearing**

{¶8} At a November 2023 emergency-custody hearing, Mother's evidence focused on Father's parental capacity to support C.Q.'s mental-health needs, protect his children from dangers associated with social media, and ensure his children's academic success.

1. *The children's mental-health needs*

{¶9} In March 2023, C.Q. used a school computer to search for information on suicide. C.Q. explained to her school counselor and principal that she had contemplated suicide because of "family problems." A Cincinnati Children's Hospital ("Hospital") employee conducted a suicide assessment of C.Q. over the phone using the Columbia Suicide Severity Rating Scale[1] ("C-SSRS"). C.Q. revealed that she had cut

---

[1] The C-SSRS consists of "a series of plain-language questions that can be used to help identify whether someone is at risk for suicide, to assess the severity and immediacy of that risk, and to gauge the level of support the person needs." *Jappen v. United States*, 771 F.Supp.3d 123, 130 (N.D.N.Y. 2025), citing Columbia University Department of Psychiatry, *Columbia-Suicide Severity*

herself the day before, struggled with body dissatisfaction, experienced auditory hallucinations, and planned and intended to attempt suicide. Based on her C-SSRS responses, C.Q. was at "high" risk for suicide. As instructed by the school, Father took C.Q. to the Hospital that day.

{¶10} At the Hospital, C.Q. reported auditory and visual hallucinations, and feeling "that she was possessed." During a safety assessment that included a second C-SSRS, C.Q. denied any suicide ideation, explained that she wanted attention, she resorted to cutting for "stress relief," and identified "living with family" as a reason for living. Based on those responses, Hospital staff considered C.Q. "not at imminent risk to harm self." Her physician concluded that C.Q. was medically "stable" and "safe for discharge," and instructed C.Q. to start psychiatric treatment.

{¶11} At the hearing, Father testified that he "look[ed] in to" finding a counselor for C.Q., but she "refused." At home, Father removed all potentially harmful objects from C.Q.'s room and, along with Grandparents, closely watched C.Q.

{¶12} In the three months before the emergency-custody hearing, C.Q. had not mentioned or attempted suicide. Father acknowledged telling C.Q. that her self-harm was the result of demonic possession. Father was aware of bullying issues that C.Q. had experienced at school and denied telling C.Q. to pray to God to resolve the issue. Rather, he was in "constant contact with the school," contacted the parents of C.Q.'s bully to resolve the issue, and had the school separate C.Q. from her bully after the bully's parent refused to act.

{¶13} At the emergency hearing, Father agreed that both C.Q. and M.Q. were "in need of therapy and counseling." In a May 2023 agreed entry, Mother and Father

*Rating Scale*, https://www.columbiapsychiatry.org/research-labs/columbia-suicide-severity-rating-scale-c-ssrs (accessed Sept. 30, 2025) [https://perma.cc/Y27N-FL6R].

agreed to find a counselor for C.Q. and required both parties to assent to the counselor. Father testified that he proposed Positive Leaps, a counseling center near his family's residence. According to Father, Positive Leaps could accommodate the parenting schedule and provide remote counseling to C.Q. when she was in North Carolina. But according to Father, Mother was "very difficult on agreeing on anything."

{¶14} Mother testified that Father told Mother that C.Q. needed to live with Mother in North Carolina because of her suicide attempt. She also explained that she rejected Positive Leaps because it was not "a good fit" and merely offered "generic counseling services." According to Mother, C.Q. and M.Q. needed counseling specializing in "sexual behaviors," and Mother found a counselor "30 or 45 minutes" from the family's residence that offered investigatory services, support groups, and inpatient rehabilitation.

{¶15} Father's mother ("Grandmother") testified that, around the time that C.Q. was "out of control" and went to the Hospital, she had threatened to evict C.Q., Father, and M.Q. because C.Q. was behaving "like she was possessed." Grandmother attributed C.Q.'s behavior to the influence of a "girl at school" who told C.Q. "to do things . . . for attention." Grandmother clarified that she did not "mean it" and was upset with C.Q.'s behavior. Since that episode, her relationship with C.Q. had improved and Grandmother described the children as "really good."

2. *The children's social-media use*

{¶16} In the summer of 2023, C.Q. and M.Q. had Snapchat and TikTok accounts that they accessed through their phones, Father's laptop, iPads bought by Father, and iPads bought by Mother. Father testified that he occasionally monitored their phones and had logged into their accounts on Snapchat, but not on TikTok.

6

**{¶17}** Mother recalled that C.Q. and M.Q. were at her home that summer when Mother found "concerning" material on their devices, such as sexually-explicit conversations on Snapchat where the girls lied about their ages and sexual photographs and videos of C.Q. and M.Q. At the time, C.Q. was 11 or 12 years old and M.Q. was nine or ten years old.[2] Mother immediately confiscated both sets of iPads and installed a parental-control application on their phones with "strict parental controls to where they only are limited . . . to five minutes on Snapchat." Mother deleted TikTok videos from C.Q.'s account depicting "sexual dancing," and videos from M.Q.'s account of her lip-syncing curse words. Later that summer, Mother was concerned with one of C.Q.'s TikTok posts that read, "If I died tonight would you miss me?" Father spoke with C.Q. and M.Q., who explained that those posts are just "something they do on TikTok."

**{¶18}** Mother testified that Father had not adequately addressed C.Q.'s and M.Q.'s inappropriate social-media activity. Father testified that the children cannot access Snapchat because Mother had removed that app, he lacks access to the parental controls to limit TikTok, and the children are not allowed to use his devices. Mother recalled that while on a video call with C.Q. before the emergency hearing, she saw M.Q. in the background "on her phone doing a TikTok," and hearing Father remark "Oh, yes, your mom . . . doesn't want you on social media." Mother had seen C.Q. and M.Q. active on social media after that. Father testified that he was open to working with Mother to terminate the children's social-media accounts.

---

[2] Both M.Q. and C.Q. have summer birthdays and Mother did not specify when, in the summer of 2023, she discovered the material on their devices.

### 3. *The children's academic needs*

**{¶19}** C.Q. and M.Q. attended school in a Cincinnati suburb and participated in ballet, cheerleading, soccer, gymnastics, and other activities. When C.Q. was in fifth grade, the school guidance counselor ("Guidance Counselor") noticed an increase in behavioral referrals for C.Q. related to attention-seeking behavior. She recalled that C.Q. was having conflicts with a friend that year. But Guidance Counselor was not aware of any issues involving C.Q. in the first half of the sixth grade.

**{¶20}** Father testified that C.Q.'s teacher informed him at a recent parent-teacher conference that C.Q. was "doing good," although there is "room for improvement." M.Q. had no issues in school. Mother testified that she was unaware of her children's academic progress in school because Father prevented her from accessing her children's school records. Yet, the original custody order gave Mother and Father joint decision-making power over the girls' education.

## B. **Magistrate's interim order**

**{¶21}** In late November 2023, the magistrate issued an interim order directing Mother and Father to "ensure the enrollment of the children into therapy" and, if the two disagreed, Mother "may select the therapy provider(s)." It instructed Mother and Father to communicate through a coparenting application. Moreover, the order directed Mother and Father to "close all existing social media accounts of the children." Plus, the children's devices "shall include a parental control monitoring programs/app that can monitor the children's accounts and alert the parties to any inappropriate sexual content or transmissions."

## C. **Custody-modification hearings**

**{¶22}** The magistrate held hearings on Mother's motion to modify the custody order in April and May 2024. Before the hearing, Mother deposed Father and the deposition transcript is in the record.

### 1. *The children's use of technology and social media*

**{¶23}** Father explained at his deposition that, consistent with the magistrate's order, "Qustodio" was installed on C.Q.'s and M.Q.'s phones. As a result, C.Q. and M.Q. could simply text, FaceTime, make calls, and play games on their phones. At one point, M.Q. removed Qustodio from her phone while at a friend's house. In response, Father punished M.Q. and reinstalled Qustodio. He also recalled that M.Q. sent TikTok usernames to a friend in a text message in March 2024. He spoke with M.Q. and believed, at the deposition, that those usernames belonged to her friend. He reiterated to the children that they cannot maintain social-media accounts.

**{¶24}** In his deposition, Father discussed sexually-suggestive text messages that C.Q. had received from a friend after the emergency-custody hearing. In another message, C.Q. mentioned having a "vape." In response, Father spoke with C.Q. about the sexually-suggestive messages and vape. C.Q. denied owning a vape and Father did not find one despite having searched "[e]verywhere in her room."

**{¶25}** At the custody hearings, Father testified that he started taking the children's behavioral issues more seriously after the deposition and was closely "monitor[ing] their texts" by reading their messages at the end of the day. He recalled catching C.Q. and M.Q. sending sexually-explicit messages, confiscating their phones, and disciplining them. But that confiscation was temporary because Mother prevented Father from taking his children's phones away permanently. And he cannot "block"

them from sending sexually-explicit messages on their phones. Rather, Mother "has the phones" on "her account" and "can block people on her end."

**{¶26}** Mother had concerns about Father's supervision of the children's use of social media. She spent "hours and hours" teaching Father how to permanently delete their social-media accounts. Mother had investigated smart watches with limited capabilities to replace C.Q.'s and M.Q.'s phones. Father's attorney stipulated that he agreed to replace the children's phones with the watches.

**{¶27}** Mother testified that C.Q. and M.Q. spent spring break in 2024 at her house. During that week, she "intercepted a group chat" discussing websites "where you can video chat anybody, any strangers." Mother explained that the group chat had sexually-explicit pictures of a grown man. She also saw evidence that C.Q. and M.Q. had tried to sell explicit pictures to adults on that website. Mother blocked and deleted that group message from their phones and contacted the children's therapist, school counselor, and Father.

**{¶28}** Mother's friend from North Carolina testified that the children are normally "on the phone" when she visits Mother's house, but Mother has them "get off" their phones. Mother's friend had never seen any inappropriate behavior.

2. *The children's mental health & supervision*

**{¶29}** Both C.Q. and M.Q. see a therapist once a week. Father testified that C.Q. "really enjoys going, talking to the therapist, and she seems happier." Occasionally, Father joins the therapy sessions. M.Q. is also "doing well" in therapy.

3. *The children's relationships*

**{¶30}** Father recalled that C.Q. had a sleepover at a friend's ("J.") house and came home with "hickeys" on her neck. Father believed that C.Q. and J. were just friends and were not dating because the two did not "go out actually on a date." One

of Mother's exhibits was messages between her and Father where he mentioned that C.Q. had dated J. before. At the custody hearing, Father testified that he thought C.Q. and J. had broken up and spoke to J.'s grandmother before the sleepover, who assured Father that C.Q. and J. would sleep in separate rooms. After the sleepover, Father asked Mother to block J.'s phone number in C.Q.'s phone, but Mother "refused."

{¶31} Father allowed C.Q. and M.Q. to spend time with J. at a skating rink. For a few weeks, Father left C.Q. and M.Q. at the rink unsupervised for "maybe an hour." One day, rink employees suspected that C.Q. and J. had kissed at the skating rink. But according to Father, "video evidence" revealed that they were "pretending." Eventually, J. was banned from the skating rink and Father instructed his children to "stay away" from J., but they did not listen. Following the April 2024 deposition, Father remained present at the skating rink, supervised his children "one hundred percent of the time," and went "everywhere they go."

{¶32} At the deposition, Father recounted finding evidence of underage drinking on C.Q.'s phone. C.Q. was at a friend's house and, with that friend, stole alcohol and consumed it at a community center. At the custody hearing, Father testified that he prohibits C.Q. from seeing that friend. In messages to friends, the children had mentioned sneaking out of Father's house. But according to Father, sneaking out of the house would be "extremely difficult" because an adult—Father or one of the Grandparents—was always awake.

{¶33} At the custody hearing, Father admitted that he was "too trusting" of his children before the deposition.

4. *The children's academics*

{¶34} Guidance Counselor testified that the children's elementary school was ranked "in the top of Ohio." She testified that M.Q. was excelling academically, but

C.Q.'s progress was inconsistent. C.Q. struggled to make up missing assignments. Yet, C.Q. had "all passing grades" in her classes and was not in danger of repeating the sixth grade. Indeed, C.Q.'s report cards showed that she improved in every academic subject except for social studies.

{¶35} Guidance Counselor had no concerns about the children's behavior at school. She worked with both children on social skills and anxiety related to "home life" in Father's and Mother's households. Guidance Counselor testified that C.Q. was in "a good place with her peers."

{¶36} Guidance Counselor described Father as "responsive" to C.Q.'s teacher's concerns about C.Q.'s grades. Father testified that C.Q. had less disciplinary and academic issues in the 2023-2024 school year compared to the 2022-2023 school year. Still, C.Q. fell behind in her classwork in multiple subjects after an illness caused her to miss school. Father rejected the suggestion that C.Q. or M.Q. had skipped school. Father admitted that, at one point, he was inconsistent with monitoring the children's grades and unaware of how many assignments C.Q. had missed. But Father said that he was proactively monitoring C.Q.'s schoolwork and missing assignments.

{¶37} Guidance Counselor described Mother as more engaged than she previously had been with the children's academics and behavior. Mother informed Guidance Counselor that C.Q. had been caught drinking alcohol, and C.Q. confirmed the incident to Guidance Counselor. Mother also reported to Guidance Counselor that a picture had surfaced showing C.Q. self-harming after March 2023, but Guidance Counselor later discovered that picture was older than March 2023. Mother emailed Guidance Counselor that one of C.Q.'s peers had shared an inappropriate picture of C.Q. around school. Guidance Counselor told Father to contact the police, and Father "follow[ed] through with that."

**{¶38}** Mother testified that before the 2023-2024 school year, she had never discussed with Father the children's grades. Since then, she was more involved with her children's schoolwork, spoke with her children regularly, and attended a parent-teacher conference at the children's elementary school for the first time. Mother testified that, unlike Father, she would not allow the children to play soccer or leave the house if they fell behind in school. She would also hire a tutor. Yet, Mother knew her children had outstanding school assignments when they spent spring break with her in 2024 and she admitted that neither child completed that work.

**{¶39}** Mother agreed that the children's school is "amazing." She testified that, if the court made her the children's residential parent, she planned to enroll them in a charter school in North Carolina and sever their ties with their friends in Ohio.

5. *Child-custody evaluation*

**{¶40}** The trial court appointed a social worker employed by the juvenile court with 18 years of experience ("Social Worker") to perform a custody evaluation for the family. Social Worker interviewed and observed the family members and reviewed questionnaires. Social Worker, however, refrained from asking the children about the sexually-explicit messages and photographs because he considered those issues inappropriate due to his "gender" and "role in their lives."

**{¶41}** Social Worker recommended that the court continue the existing custody arrangement because "[n]either parent is sorely deficient in parenting skills and the children are bonded well to each of them." That recommendation was consistent with the children's statements to Social Worker. Social Worker noted that parental conflict and a lack of collaboration is the "obvious problem" in the family.

13

**D. The juvenile court sustained Father's objections**

{¶42} The magistrate granted Mother's motions to terminate the parenting plan, modify parenting time, modify child support, and reallocate parental rights and responsibilities. After reviewing the relevant statutory factors, the magistrate found that a change to the custody order is in the children's best interest and that the benefits of a modification outweighed any harm caused by a change in environment. The magistrate's findings focused on Fathers "persistent neglect and inability to properly supervise and guide the minor children."

{¶43} Father objected and, following a hearing, the trial court sustained Father's objections and denied Mother's motion. The trial court found that there had been no change in circumstances, that modification was inconsistent with the children's best interests, and that the benefit of a change did not outweigh any harm.

## II. *Analysis*

{¶44} In a single assignment of error, Mother raises several issues with the trial court's decision rejecting the magistrate's findings and conclusions. First, she argues that we should afford deference to the magistrate's findings because the magistrate's firsthand observations placed him in a better position to assess witness credibility. Building on that principle, Mother argues that the trial court abused its discretion when it rejected the magistrate's change-in-circumstance and best-interest findings, and the magistrate's weighing of the benefits of modification against the harm to the children.

{¶45} We start with the principle that "[c]hild-custody decisions 'are some of the most difficult and agonizing decisions a trial judge must make.'" *Ijakoli v. Alungbe,* 2024-Ohio-5287, ¶ 46 (1st Dist.), quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). For decades, Ohio courts have deferred to trial courts on custody issues, which

are "particularly rife with accusations and factual discrepancies" because trial courts are "often best positioned to sort out the crucial credibility issues in these disputes." *In re L.F.*, 2023-Ohio-4199, ¶ 20 (1st Dist.).

**{¶46}** We review trial courts' judgments involving child-custody issues for an abuse of discretion. *Souders v. Souders*, 2022-Ohio-1953, ¶ 6 (1st Dist.), citing *Davis* at 416. To reverse, we must find that the trial court's rejection of the magistrate's decision, and denial of Mother's motions, was so unwarranted as to constitute an abuse of discretion. *See Johnson v. Abdullah,* 2021-Ohio-3304, ¶ 35. A trial court does not abuse its discretion simply because an appellate court "'might have not reached the same conclusion.'" *Kane v. Hardin,* 2019-Ohio-4362, ¶ 6 (1st Dist.), quoting *State v. Morris*, 2012-Ohio-2407, ¶ 14 (1st Dist.). Instead, a trial court abuses its discretion where its decision is "unreasonable or arbitrary." *Id.* We have explained that a trial court abuses its discretion where its custody decision "is not supported by competent, credible evidence." *Edelstein v. Edelstein,* 2025-Ohio-1514, ¶ 37 (1st Dist.).

## A. Deference to the magistrate's decision

**{¶47}** Mother argues that the magistrate heard, saw, and evaluated the witnesses, and weighed those observations when it granted Mother's motions and modified custody. So, Mother argues, the magistrate's findings are entitled to the benefit of a more deferential review and, since the trial court lacked the firsthand observations, we should apply a more searching review of the trial court's decision.

**{¶48}** Civ.R. 53 governs proceedings referred to a magistrate. A magistrate's decision carries no force of law until formally adopted by the trial court. *See* Civ.R. 53(D)(4)(a). While magistrates play an important role in Ohio's court system, they are "'arm[s] of the court, not [] separate judicial entit[ies] with independent judicial authority and duties.'" *In re A.S.*, 2019-Ohio-2359, ¶ 20 (1st Dist.), quoting *State ex*

*rel. Dewine v. Ashworth,* 2012-Ohio-5632, ¶ 37 (4th Dist.); *see Yantek v. Coach Builders, Ltd.*, 2007-Ohio-5126, ¶ 9 (1st Dist.) ("Magistrates are neither constitutional nor statutory courts.").

**{¶49}** When a party objects to the magistrate's decision, the trial court must "undertake an independent review . . . to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d). While the magistrate presides over a "hearing, the trial court, not the magistrate, is the ultimate trier of fact." *In re A.S.* at ¶ 20. The trial court must independently analyze issues of fact and law "even if [the] trial court is limited to reviewing the trial in the form of a transcript." *Id.* In other words, the trial court must "employ its own judgment in a case even if it refers a matter to a magistrate." *Hart v. Spenceley*, 2013-Ohio-653, ¶ 13 (12th Dist.); *see Durastanti v. Durastanti*, 2020-Ohio-4687, ¶ 21 (1st Dist.) ("The trial court is by no means required, in all circumstances, to give deference to the magistrate's factual findings."); *see also First Natl. Bank of Southwestern Ohio v. Individual Business Servs.*, 2008-Ohio-3857, ¶ 11 (2nd Dist.) ("[A] trial court need not defer to a magistrate's determinations regarding witness credibility."). Of course, the court may adopt a magistrate's findings where "'the trial court fully agrees with them.'" *Hart* at ¶ 15, quoting *Rapp v. Pride*, 2010-Ohio-3138, ¶ 14 (12th Dist.). But the trial "court, after reviewing the transcript of the proceeding before the magistrate, [is] free to disagree with the magistrate's conclusions and to enter an order it found to be in the children's best interest." *In re H/B*, 2021-Ohio-1109, ¶ 29 (1st Dist.).

## B. Custody modification under R.C. 3109.04(E)

**{¶50}** In Ohio, a trial court "shall not" modify an existing custody decree unless it "finds . . . that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree,

and that the modification is necessary to serve the best interest of the child." R.C. 3109.04(E)(1)(a). In addition, the trial court must find that one of three conditions applies to the case under R.C. 3109.04(E)(1)(a)(i)-(iii). Relevant here, modification is proper if "[t]he harm likely to be caused by a change in environment is outweighed by the advantages of the change of environment to the child." R.C. 3109.04(E)(1)(a)(iii). We address Mother's challenges to each of the trial court's findings in turn.

   1. *The children's behavioral change constitutes a change in circumstances*

**{¶51}** The trial court sustained Father's objections and rejected the magistrate's decision because, in part, it did "not find that a change has occurred in the circumstances of the children or either of the parents." Mother argues that the trial court abused its discretion when it found that a change in circumstance had not occurred and contends that the trial court should have followed the magistrate's findings. But while the magistrate explained that a change in circumstance is a prerequisite to modifying custody, the magistrate did not make any change-in-circumstances findings.

**{¶52}** Custody may be modified "based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree [and where] a change has occurred in the circumstances" of the family. R.C. 3109.04(E)(1). This threshold finding spares children living under a custody order "from a constant tug of war" if the parents frequently move to modify a custody order. *Fisher v. Hasenjager*, 2007-Ohio-5589, ¶ 34. A stable and secure childhood promotes a child's "emotional and physical development." *In re James*, 2007-Ohio-2335, ¶ 28, quoting *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991).

**{¶53}** Ohio's custody statutes do not define "change of circumstances," but courts have construed the phrase to mean ""a change of substance, not a slight or

inconsequential change.""" *Bohannon v. Lewis*, 2022-Ohio-2398, ¶ 16 (1st Dist.), quoting *In re E.R.,* 2019-Ohio-4491, ¶ 6 (1st Dist.), quoting *Davis*, 77 Ohio St.3d at 418. To modify a custody order, a change in circumstances must be """substantiated, continuing, and have a materially adverse effect upon the child.""" *Id.*, quoting *In re E.R.* at ¶ 6, quoting *Davis* at 417.

**{¶54}** The party seeking to establish a change in circumstances bears a "significant burden to show that a change in circumstances has occurred." *Hobbs v. Hobbs*, 2015-Ohio-1963, ¶ 55 (4th Dist.). In custody proceedings, trial courts have latitude to consider any issues related to a change of circumstances. *See Davis* at 418. Therefore, we review the trial court's change-of-circumstances finding for an abuse of discretion. *See In re A.S.*, 2016-Ohio-7622, ¶ 12 (2nd Dist.).

**{¶55}** Mother argues that C.Q.'s academics and suicide attempt in the spring of 2023, as well as the children's behavior, constitute a change in circumstances.

<u>Academics</u>

**{¶56}** Courts have held that a child's academic regression rises to a change in circumstances "when the child's overall academic progress was 'dismal' and when other changes occurred in the child's life." *Hobbs* at ¶ 55. But minor or temporary lapses in a child's academic performance are insufficient to show a change in circumstances. *Id.*

**{¶57}** Here, Guidance Counselor described C.Q. as a "C+" student, and her grades in sixth grade were consistent with that assessment. While her grades slipped in the first semester of sixth grade, she had improved her grades in all but one core subject by the second semester. While the trial court did not explain why it found that a change of circumstances had not occurred, it could have found that C.Q.'s academics did not rise to a change in circumstances.

18

Mental health and behavior

**{¶58}** Courts have considered both a child's mental-health struggles and behavioral issues as factors to consider when determining whether a change in circumstances has occurred. *See Hobbs,* 2015-Ohio-1963, at ¶ 56 (4th Dist.); *see also In re Marriage of Craft*, 2022-Ohio-493, ¶ 117 (2d Dist.).

**{¶59}** C.Q.'s and M.Q.'s recurring behavioral issues—engaging in sexually-oriented activities—combined with C.Q.'s mental-health struggles, establish a change in the children's circumstances that is consequential. Therefore, the trial court's finding to the contrary was unreasonable and an abuse of discretion.

### 2. *A trial court must determine the children's best interest*

**{¶60}** A trial court may modify custody under R.C. 3109.04(E)(1)(a) only where modification is in the child's best interest, which is a """"fluid concept [reflecting] . . . the child's continually-changing need for appropriate care."""" *In re K.D.*, 2024-Ohio-5582, ¶ 50 (1st Dist.), quoting *In re D.V.*, 2022-Ohio-1024, ¶ 12 (1st Dist.), quoting *In re D.M.*, 2020-Ohio-3273, ¶ 47 (1st Dist.), quoting *In re G.L.S.*, 2018-Ohio-1606, ¶ 16 (9th Dist.). A party seeking to modify a custody decree must rebut the statutory "presumption that retaining the residential parent designated by the decree is in the child's best interest." *Steele v. Steele,* 2021-Ohio-3697, ¶ 22 (2d Dist.).

**{¶61}** When deciding a motion to modify an existing custody decree, a trial court must consider all factors relevant to a child's best interest, including:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers . . . regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

19

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent . . . has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child . . . ;

(i) Whether the residential parent or one of the parents subject to a shared-parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

{¶62} While the trial court must consider each relevant factor, it does not need to set forth a detailed analysis of each statutory factor. *See In re G.B.*, 2022-Ohio-382, ¶ 66 (8th Dist.). And when weighing the relevant statutory factors, "[n]o one factor is dispositive in the best-interest calculus." *In re Z.F.*, 2024-Ohio-1698, ¶ 43 (1st Dist.).

{¶63} Mother challenges the trial court's statutory findings involving the children's interactions and interrelationships, their adjustment to life in Cincinnati,

their mental health, the parent more likely to facilitate parenting time and rights, issues of neglect, and Mother's residence in North Carolina.

Interactions and interrelationships

{¶64} Mother takes issue with the trial court's R.C. 3109.04(F)(1)(c) analysis of the children's interactions and interrelationships. The trial court found that C.Q. and M.Q. "have positive interactions with both parents" and "enjoy spending time with family here in Cincinnati." Moreover, it noted that C.Q. and M.Q. have "deep ties here in Cincinnati with friends, classmates, and relatives."

{¶65} Mother first argues that the evidence undermines the trial court's finding that C.Q. has positive relationships with Father and Grandmother. Mother points out that Father admitted to telling C.Q. that her mental-health issues were the result of demonic possession and that Grandmother threatened to evict C.Q. during her mental-health struggles. While these statements are concerning, the trial court could have concluded, based on the evidence in the record, that Father and C.Q. have a positive relationship. Social Worker observed Father's interactions with C.Q. and M.Q. and described the children as "being at ease" with Father, who was "responsive and attentive" during the observation. As for Grandmother, Social Worker noted that C.Q. and M.Q. "are close to their paternal grandparents." That is consistent with both Grandparents' testimony describing positive relationships with their granddaughters.

{¶66} Mother also asserts that the children's interactions with their peers weighs in favor of changing the custody decree due to the children's behavioral issues around their friends. It is true that C.Q. had experienced bullying, drank alcohol, and, along with M.Q., exchanged sexually-explicit messages with friends. But Guidance Counselor testified that C.Q. was "in a good place with her peers" and C.Q.'s bully had

changed schools. Moreover, Father testified that C.Q. could not spend time with the friend involved in the underage-drinking incident.

**{¶67}** In sum, the trial court's conclusion that the children had positive relationships with Father, Grandmother, and the children's friends is supported by competent and credible evidence.

### Adjustment to home, school, and community

**{¶68}** Next, Mother argues that there is overwhelming evidence proving that C.Q. and M.Q. are not adjusted to Father's home, their school, and community. She maintains that the children are "experiencing extensive, ongoing social problems, are engaged in dangerous social behaviors with their peers (included repeated instances of sexting and sharing sexually suggestive content; and C[.Q.] engaging in sexual behaviors with a girlfriend), communicating with an adult male predator (receiving and being solicited for sexually explicit photos)," failing academically, and drinking alcohol. Mother contrasts Grandmother's eviction threat with her promise of tutoring for the girls and the safety of living under the security system in her home.

**{¶69}** But there is evidence supporting the trial court's findings involving the children's adjustment to Father's home, school, and community. By the time of the April and May 2024 custody-modification hearings, Father was increasingly engaged as a parent and had provided the necessary structure for his children in his home. He was reading the girls' text messages, supervising them in public, and providing consequences for their misbehavior. Plus, the children were caught sending explicit text messages in both Father's and Mother's houses. So, the trial court could have concluded that their misbehavior does not reflect a maladjustment to Father's home.

**{¶70}** While Mother argues that C.Q.'s academic struggles contradict the trial court's findings, C.Q.'s grades show that she was generally improving academically.

Moreover, Guidance Counselor testified that C.Q. had shown social and emotional growth in the latter half of her sixth-grade year.

{¶71} Competent and credible evidence supports the trial court's findings under this statutory factor.

### The children's mental health

{¶72} Turning to R.C. 3109.04(F)(1)(d), the trial court found that C.Q. and M.Q. are "in therapy to address various issues" and C.Q. "has more serious mental health issues that are being addressed in therapy." Mother argues that the trial court's finding is "dangerous" because it is "superficial and perfunctory." Mother contends that Father "defied medical advice and waited months to get therapy," prioritizes C.Q.'s wishes over her need for mental-health treatment, and simply sat "idle" as C.Q. struggled with mental-health issues.

{¶73} Father admitted that he did not initially try to find a counselor for C.Q. after her visit to the Hospital because she refused to go. But his position had changed by May 2023 when the parties agreed to find her a counselor. And he did find her a counselor, but Mother disagreed with his choice. Mother also found a counselor, but Father thought it was too far away from Father's house. By April and May 2024, Father had attended some of C.Q.'s counseling sessions and was routinely communicating with her counselor. Moreover, Guidance Counselor testified that Father followed the school's recommendation to take C.Q. to the Hospital in March 2023 and to report C.Q.'s bully to the police for sharing suggestive photos of C.Q.

{¶74} In sum, there was competent evidence that Father was responsive to C.Q.'s mental-health needs at the custody hearings, supporting the trial court's finding under this statutory factor.

The parent more likely to honor parenting time and visitation

{¶75} Under R.C. 3109.04(F)(1)(f), the trial court found that both Mother and Father honored parenting time. Mother contends that Father interfered with her ability to monitor their academic progress.

{¶76} The original custody decree granted Mother joint decision-making power over the children's education. It is unclear how Father prevented Mother from reading the terms of that decree. More to the point, the trial court could have concluded, based on competent evidence, that Father has helped facilitate Mother's parenting time with the children and will continue to do so. Father moved to Cincinnati to bring his daughters closer to Mother and told Social Worker that he wanted the children to see Mother more. Therefore, the trial court was reasonable when it found that Father will likely facilitate and honor Mother's parenting time.

Invited and forfeited errors

{¶77} Turning to whether a party has been involved in a case of abuse or neglect under R.C. 3109.04(F)(1)(h), the trial court found that this factor is inapplicable to the case. Mother argues that this finding is unreasonable and that the trial court should have found that Father's actions amounted to neglect in violation of R.C. 2151.03(A)(4).

{¶78} But in her brief to the magistrate and response to Father's objection to the magistrate's decision, Mother asserted that R.C. 3109.04(F)(1)(h) "is not applicable." The invited-error doctrine bars a party from taking "advantage of an error that the party has invited or induced the court to make." *Knowlton v. Shultz,* 2008-Ohio-5984, ¶ 75 (1st Dist.). Mother invited any potential error and may not challenge the trial court's finding on appeal.

**{¶79}** Next, the magistrate and trial court noted Mother's North Carolina residence as a finding under R.C. 3109.04(F)(1)(j). Mother argues that this finding encroaches on her rights under the Privileges or Immunities Clause of the Fourteenth Amendment to the United States Constitution, which guarantees that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."[3] U.S. Const., amend. XIV, § 1.

**{¶80}** But Mother did not raise this issue in an objection to the magistrate's decision or in response to Father's objection. As a foundational principle of appeals, "a party ordinarily may not present an argument on appeal that it failed to raise below." *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 10. When a matter is referred to a magistrate, "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion . . . unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." Civ.R. 53(D)(3)(b)(iv). A party who fails to raise an issue to the trial court, when given the chance, "'forfeits the right to assign those issues as error on appeal.'" *Burd v. Artis*, 2025-Ohio-625, ¶ 9 (1st Dist.), quoting *Marrs v. Mickel*, 2023-Ohio-4528, ¶ 12 (8th Dist.).

**{¶81}** A party, however, may still challenge an otherwise forfeited argument as a plain error. *Burd* at ¶ 10. But Mother does not argue on appeal that the trial court's consideration of her moving to North Carolina amounted to plain error. An appellate court "'need not analyze plain error when the appellant has failed to make a plain error argument.'" *Id.*, quoting *Marrs* at ¶ 15.

---

[3] Mother quotes the Fourteenth Amendment's Privileges or Immunities Clause but cites to the Privileges and Immunities Clause under U.S. Const., art IV, § 2, which guarantees that "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

**{¶82}** We hold that competent and credible evidence supported the trial court's statutory findings under R.C. 3109.04(F)(1). And even if some judges on this court may have reached different findings, this is not enough to find an abuse of discretion. The trial court could have reasonably found that Father had taken steps to respond to his children's mental-health needs and worked to address his children's behavioral challenges. Father's responsiveness and engagement as a parent supports the trial court's conclusion that a modification of the custody decree is not necessary to serve the children's best interest.

**{¶83}** Because we hold that the trial court acted within its discretion when determining that modifying custody was not necessary to serve the children's best interests, we do not reach the issue of whether the harm caused by a change in environment is outweighed by the advantages of the change of environment under R.C. 3109.04(E)(1)(a)(iii).

**{¶84}** In sum, we hold that the evidence sufficiently showed a change in circumstances under R.C. 3109.04(E)(1). But because competent evidence supported the trial court's finding that modification is not in the children's best interest, the trial court did not abuse its discretion by sustaining Father's objections to the magistrate's decision and denying Mother's motion to modify the custody order. We overrule Mother's assignment of error.

### III. Conclusion

**{¶85}** We overrule Mother's assignment of error and affirm the trial court's judgment.

Judgment affirmed.

CROUSE, P.J., and MOORE, J., concur.